

PEDRO F. VAZQUEZ )
)
           Plaintiff, )
)
    v. )  Case No. 05 C 5066
)
JO ANNE B. BARNHART, )  Magistrate Judge Arlander Keys
Commissioner of Social )
Security, and SHERRY CHILLIS, )
on behalf of M.L.H. and )
M.D.H., )
)
          Defendants. )

### MEMORANDUM OPINION AND ORDER

The Commissioner of Social Security (the "Commissioner")
moves this Court for Summary Judgment, pursuant to Rule 56(a) of
the Federal Rules of Civil Procedure. The Commissioner asks that
the Court affirm its decision denying Plaintiff's claim for
Disability Insurance Benefits ("DIB".) 42 U.S.C. § 405(g)
(2003.) For the reasons set forth below, the Commissioner's
Motion is Granted.

### Background Facts

Plaintiff emigrated from Mexico to the United States and, in
approximately 1990, became a citizen of the United States.
Plaintiff is unable to effectively communicate in English.
In July of 1998, and again in April of 1999, Plaintiff hurt his
back while working at a bakery, where he had been employed for

fourteen years. Plaintiff's physician concluded that he was unable to return to his past position, and his employer offered him light work at the bakery. Plaintiff was fired from the bakery in December of 1999, and worked sporadically until February of 2001, when he was laid off from his job as a cable tester. Plaintiff applied for and received unemployment compensation during 2001, and in October of 2002, Plaintiff ultimately settled the workers compensation claim that he had filed against the bakery.

On May 24, 2002, Plaintiff filed an application for DIB, alleging that he became unable to work on February 14, 2001, due to disc problems, a herniated disc, and a shorter right leg. His application was denied initially and upon reconsideration. Plaintiff requested and received a hearing before an Administrative Law Judge ("ALJ"). Despite contacting several attorneys in the hopes of securing representation, Plaintiff appeared at his November 30, 2004 hearing unrepresented. ALJ Helen Cropper postponed the hearing to provide Plaintiff with additional time to secure counsel.

On February 14, 2005, however, Plaintiff again appeared without counsel for his rescheduled hearing before ALJ Cropper. Plaintiff attended the hearing with his son. Plaintiff testified at the hearing, with the assistance of an interpreter. Vocational expert ("VE") Thomas Dunleavy also testified.

On February 23, 2005, the ALJ found that Plaintiff was not disabled, because he remained able to perform his past relevant work, as well as a significant number of other jobs in the economy. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of that decision.

On September 2, 2005, Plaintiff filed suit in this Court, pursuant to 42 U.S.C. § 405(g), seeking review of the ALJ's decision. The case was initially assigned to Judge Robert W. Gettleman, and the parties subsequently consented to proceed before this Court. Still unable to secure counsel, Plaintiff has litigated this matter pro se.

On December 19, 2005, the Court directed Plaintiff to file a Motion for Summary Judgment challenging the Commissioner's decision on or before January 20, 2006. By January 25, 2006, however, Plaintiff had failed to file his Motion and neglected to attend the status hearing scheduled for that day. The Court extended the time for Plaintiff to file his Motion to February 15, 2006. On February 21, 2006, the Court noted that Plaintiff had neither filed his Motion nor attended the scheduled status hearing, and directed the Commissioner to file her own Motion for Summary Judgement. The Commissioner complied, filing her Motion on April 20, 2006. Despite a formal reminder from the Court, Plaintiff failed to file a Response to the Commissioner's Motion.

## I. **Testimony at the Hearing**

At the hearing, both Plaintiff and VE Dunleavy testified. Although Plaintiff's son accompanied him to the hearing, he did not testify on Plaintiff's behalf.

### Plaintiff's Testimony

Plaintiff, Pedro F. Vazquez, was 39 years old at the time of his hearing, and said that he had attended high school in Mexico[1]. He stated that he does not live with his wife, but instead migrates from his brothers' homes to his cousin's house. Plaintiff explained that his wife, who lives in Mexico, was in the process of divorcing him. Two of the couple's four children live in Mexico, and two live with Plaintiff. Plaintiff testified that he frequently travels between Chicago and Mexico.

Plaintiff stated that he worked at the La Francaise Bakery from 1985 until 1999. Plaintiff's job required him to lift and carry heavy racks of breads and pastries; carry sacks of flour, sugar, and syrup; and mix dough. Plaintiff injured his back while working in July of 1998, and again in April of 1999. In light of his injuries, Plaintiff's employer permitted him to do light work, supervising others at the bakery, until December of 1999, when the bakery terminated him for breaking a work rule.

---

[1] Dr. Biale's Report notes that Plaintiff reported having only attended grammar school.

Next, Plaintiff went to work for a company that he
identified as Amphenol, installing and testing computer cables.
He trained for the position for "two or three months," and worked
for Amphenol for another six or seven months. R. at 337.
Plaintiff claims that he had "trouble" doing the work; including
fatigue, and difficulty sitting or standing for long periods of
time. *Id.* He was laid off from Amphenol on February 13, 2001,
and received unemployment compensation for approximately nine
months after his termination. Following his position at
Amphenol, Plaintiff worked for a short time at a burrito
restaurant, which proved to be too physically demanding, and for
the Burling Game Industries.

Plaintiff stated that a chiropractor, Dr. Martinez, informed
him that his spinal cord doesn't sit straight, that it goes zig
zag. Plaintiff testified that Dr. Martinez recommended that
Plaintiff see another physician, where he could obtain a less
expensive MRI. The MRI revealed that Plaintiff had two discs
without liquid in them, that caused pain and made it difficult to
stand.

In October of 2002, Dr. Martinez recommended that Plaintiff
see a specialist. Plaintiff instead went to Mexico. Plaintiff
testified that he received treatment in Mexico, but declined to
have the surgery that his Mexican physicians recommended. While
in Mexico, Plaintiff twice attempted to commit suicide. He

5

stated that he was hospitalized in a psychiatric ward in Mexico for fourteen days, and was taking medication associated with his unidentified mental condition for three months.

Plaintiff testified that he is embarrassed to tell his other physicians about the suicide attempts, but his embarrassment prevents him from seeking treatment at a free clinic. Plaintiff stated that he felt depressed every time he sees his children, or thinks about his impending separation from his wife.

Dr. Martinez also referred Plaintiff to Dr. Finnick, whom Plaintiff described as a surgery specialist. Dr. Finnick recommended surgery, and sent Plaintiff to Cook County Hospital to see an orthopedic doctor and to have an MRI.

When the AlJ asked Plaintiff how often he experienced pain, Plaintiff replied that he feels constant pain in his neck, and that he frequently feels pain in his back and head. He stated that he takes Ibuprofen and Tylenol, which help with his head pain, but not his back pain. Plaintiff stated that he cannot lift anything heavier than a can, that he can stand or sit for only 20 to 30 minutes before experiencing back pain; that he can walk half a mile; and that his hands hurt when he performs simple tasks, such as tying his shoes.

Plaintiff then described his average day, explaining that he typically eats breakfast, watches television, vacuums the floors, prepares meals, socializes with family and friends, grocery

shops, and drives. Plaintiff stated that he attends church every week, and visits Mexico often.

<u>VE Dunleavy's Testimony</u>

The ALJ asked VE Dunleavy what jobs might be available to an individual, like Plaintiff, who could do light work that did not require climbing stairs, ropes, or scaffolds, or working on unstable surfaces; required only occasionally climbing ramps or stairs, stooping, kneeling, crouching, or crawling; and did not require being at unprotected heights or around unguarded hazardous machinery. The VE testified that such a person could perform Plaintiff's past relevant work as an electronics tester and technician.

The VE elaborated that, even if such a person could perform only sedentary (as opposed to light) work, with the same limitations as described above in the ALJ's hypothetical, he could still perform his past work as an electronics tester and technician. The VE stated that, given the limitations described by the ALJ, Plaintiff could also perform the following jobs: assembler (6,000 sedentary and 4,800 sedentary with a sit stand option); packer (4,000 sedentary and 3,200 sedentary with a sit stand option); and sorter (2,000 jobs, but a sit stand option would not be available). The VE testified that employers in the types of occupations described above typically tolerate an

employee who is off-task and not productive for as many as five minutes each hour, in addition to lunch and break times.

## II. Medical Evidence

The Medical evidence in this case includes medical records from hospitals and doctors in Mexico. These documents have been translated from Spanish to English, and the Court's decision relies on the English translations of those Records.

Gottlieb Hospital Occupational Health Clinic

Plaintiff visited the Gottlieb clinic on July 24, 1998. Plaintiff reported that he had lifted a 100 pound bag at work, and began to feel pain in his low back. He was diagnosed with a sprain of the lower spine. R. 250. The doctor advised Plaintiff to take Motrin and to use an ice bag, followed by heat.

Illinois Masonic Medical Center

On October 16, 1998, Plaintiff informed his physician that he had been having back pain for the preceeding two months, following his injury. His physician ordered an Xray taken of his thoracolumbar spine. The findings revealed no fracture, dislocation or destructive changes. All signs appeared normal. R. at 273. Plaintiff was prescribed a trial of ibuprofen and was recommended for physical therapy. Plaintiff reported for physical therapy on October 23, 1998, and was taught a home exercise program to be undertaken in addition to his biweekly physical therapy.

8

## Elmhurst Memorial Hospital

On April 9, 1999, Plaintiff visited Elmhurst Memorial Hospital, after hurting his back at work. The examining physician, Dr. Jacob, stated that Plaintiff could not return to work until April 12, 1999, and recommended physical therapy. During his follow up visit on April 17, 1999, Plaintiff complained of continued back pain, reporting that the pain was exacerbated if he remained in the same position for an extended period. The doctor ordered lumbar x-rays and prescribed Vicodin and Flexeril, and was referred to an orthopedic specialist, Dr. Martin Greenberg.

## Advocate Occupational Health/Bethany Hospital

Following his second accident, Plaintiff pursued physical therapy at the Northlake Center of Advocate Occupational Health, between April 12, 1999, and April 28, 1999. Plaintiff's back was tender, he had a reduced range of motion, and a positive SLR on the left. Plaintiff missed at least three of his fourteen treatments with John McConnell, D.O., who restricted Plaintiff to lifting no more than 20 pounds, and from doing more than rare squatting or bending. Plaintiff was also given an oral steroid burst.

## Dr. Martin J. Greenberg

Dr. Greenberg treated Plaintiff following his second accident. On April 19, 1999, Dr. Greenberg noted that a physical

9

examination revealed negative straight leg raising at 70 degrees bilaterally. Paravertebral muscle spasm was noted. Posterior columns and lateral spinothalamic tract exam was normal. Muscle strength quad, anterior tib, EHL and gastoc were 5/5. Knee jerk and ankle jerk were 1+ and symmetric. Babinskis were downgoing. No meralgia pareasthetica, tronchanteric bursitis or sacroilitis was present.

On May 3, 1999, Dr. Greenberg noted that Plaintiff had an MRI that revealed a left L4-5 paracentral disc herniation, and that Plaintiff was taking a Medrol Dosepack and two Vicodin pills, which relieved some of his pain. R. at 220. The MRI was performed by Dr. Bavid Beigler.

Dr. Greenberg recommended an epidural steroid injection, and directed Plaintiff to contact Dr. Julie Wehner, a spine specialist at the Spine and Orthopaedic Surgery Center, where Dr. Greenberg also worked. Plaintiff was released to return to work on August 12, 1999.

## Dr. Kenneth Branton[2]

Dr. Greenberg referred Plaintiff to Dr. Branton at the Illinois Masonic Medical Center's Pain clinic. On physical examination, Plaintiff appeared fit and trim. The doctor noted that Plaintiff suffers from paravertebral spasms and lumbar

---

[2] The ALJ refers to this physician as Dr. Branson. Because the relevant correspondence and records identify him as Dr. Branton, so will the Court.

radiculopathy. Dr. Branton recommended a series of epidural injections.

## Dr. Martinez - Chiropractor

Dr. Martinez examined Plaintiff on November 7, 2002. Plaintiff noted that he received symptomatic relief with chiropractic therapy, including acupuncture. Dr. Martinez noted that Plaintiff was improving and that lumbar motion was not restricted. Plaintiff's reflexes were normal and his sensation was decreased in his right leg. On November 12, 2002, Dr. Martinez diagnosed Plaintiff with lumbosacral disc herniation, sciatica, and myofascitis, and he recommended an orthopedic evaluation.

## Dr. Margaret Stronska

Dr. Stronska examined Plaintiff on June 17, 2002, at the request of the Social Security Administration ("SSA"). The doctor noted that Plaintiff was oriented, cooperative, was able to follow instructions, and had good general understanding and concentration. Plaintiff denied using drugs or alcohol, admitted that he had not seen a physician in the past two years, and was taking only Tylenol and Ibuprofen for pain.

Dr. Stronska noted that Plaintiff limped on his right leg, and that his right leg was one inch shorter than his left leg, but that this did not prevent Plaintiff from getting up onto the examining table. Plaintiff's extremity motion was normal,

11

strength in all extremities was full, sensation was intact, and there was no atrophy. Dr. Stronska found no neurological signs of compression from any alleged herniation, and strength, sensation, and motion of the lumbar spine were preserved.

Dr. Peter Biale

Dr. Biale examined Plaintiff on November 13, 2002, noting that Plaintiff was cooperative and was in no acute distress. Dr. Biale noted that Plaintiff had a normal gait, and moved from a seated to a supine position, and back again with complaints of pain. Motion in all joints was full, but Plaintiff had difficulty squatting, heel to toe walking, and getting on and off the examining table. Dr. Baile found that Plaintiff's cervical and dorsal spine motion was normal, dorsolumbar spine motion was limited, and that his bilateral straight leg raising was only 60 degrees - 30 degrees below normal. Dr. Biale noted that sensation in Plaintiff's left lower extremity was diminished, and that Plaintiff's right leg was two centimeters shorter than his left leg. Plaintiff's reflexes were normal and there were no strength deficits in the extremities.

Plaintiff related effectively, was alert and oriented, his memory was intact, he was able to concentrate and maintain his attention span, and had no apparent mood or thought disorder. Plaintiff had a normal mental status examination.

12

## State Agency Physicians

Eldon Rohfling, Dr. Harry Bergmann, and Dr. Paul E. Smalley reviewed Plaintiff's medical records, and in July and November of 2002, they assessed Plaintiff's ability to work. The physicians reported that Plaintiff could lift and carry 50 pounds occasionally, and 25 pounds frequently, stand and walk six hours, and six hours in a given work day.

## Instituto Mexicano Del Seguro Social

The Institute noted that Plaintiff had been treated at the Trauma Unit. A February 18, 2003 examination showed preserved but painful lumbar flexion and extension, and Plaintiff could walk on his heels and toes.

On August 1, 2003, Plaintiff was transferred from the General Hospital in Cuernavaca in Mexico to the San Fernado Psychiatric Hospital, because of suicidal intention and persistent suicidal rumination.

On March 10, 2004, Dr. Oroza discharged Plaintiff from neurology, because he did not meet the basic requirements for a surgery that had been scheduled for that day. Specifically, he failed to obtain new labs and have relatives donate blood, as he had been instructed to do.

## Dr. George Kurtza. Lakeside Surgery Center

Plaintiff underwent MRI of the lumbar spine on November 14, 2004. The results showed mild disc protrusion/herniation at L4-5

and L5-S1, without significant spinal stenosis. R. at 203.    There
was generalized bilateral neuroforaminal narrowing.

Stroger Hospital Emergency Room

Plaintiff visited the Stroger Hospital ER on January 24,
2005, complaining of a seven-year history of severe low back
pain.    An x-ray of his lumbar spine was normal, and he was
advised to make a follow-up appointment at the Fantus orthopedic
clinic

### III.    The ALJ's Decision

The ALJ reviewed the entire record and applied the Five Step
sequential process set forth in the Commissioner's regulations
for evaluating disability.    The ALJ first determined that
Plaintiff had not engaged in disqualifying substantial gameful
activity during the relevant time.

Next, the ALJ concluded that Plaintiff's degenerative disc
disease, which affects his lumbar spine, along with his
depression and alcohol dependence are severe impairments, under
Step Two of the regulations.    Nevertheless, the ALJ determined
that Plaintiff's impairments, neither alone nor in combination,
did not meet or equal the criteria of any section of the Listing
of Impairments.    Specifically, the ALJ determined that Plaintiff
did not meet Listing 1.04A, which applies to spinal disorders,
because the record did not document a consecutive 12 month period
of ineffective ambulation, nor marked and persistently abnormal

clinical signs. The ALJ similarly concluded that Plaintiff's depression did not meet Listing 12.04, which relates to depression and other mental disorders, because the record did not indicate that his symptoms markedly affected his functional capacity.

At Step Four, the ALJ assessed Plaintiff's residual functional capacity ("RFC"). The ALJ determined that Plaintiff retained the capacity to lift, carry, push and/or pull up to 20 pounds occasionally, and up to 10 pounds frequently; sit, stand, and/or walk throughout a normal workday, with typical breaks; never climb ladders, ropes, or scaffolds, or work on moving or unstable surfaces; occasionally climb ramps or stairs, stoop, kneel, crouch or crawl; and avoid exposure to unprotected heights or unguarded hazardous equipment. In addition to a wide range of light work, the ALJ concluded that Plaintiff also retained the ability to perform sedentary work, with the same aforementioned limitations. The ALJ found that Plaintiff's past job as a cable tester was not precluded by these limitations, both as Plaintiff performed it and as it is typically performed. Therefore, Plaintiff could perform his past relevant work and was not disabled. In addition, the ALJ found that, in light of Plaintiff's RFC, together with the VE's testimony, there were a significant number of other jobs in the economy that Plaintiff could perform, in addition to the cable tester position.

The ALJ stated that she could not give full credit to Plaintiff's claim that he is disabled by constant, severe low back pain. In commenting on Plaintiff's credibility, the ALJ noted that his objective abnormalities were relatively mild, and that his injuries did not prevent him from working light duty at both the bakery and Amphenol for extended periods of time.

Despite the fact that Plaintiff had, at certain times, insurance coverage and, later, proceeds from his worker's compensation claim, Plaintiff did not seek treatment for his injuries, and only resumed seeking treatment a few weeks before his hearing was scheduled. In addition, Plaintiff claimed that most of his pain was relieved by over the counter medications, and he frequently traveled between the United States and Mexico.

## Standard of Review

In reviewing the ALJ's decision, the Court may not substitute its own judgment for that of the Commissioner, reevaluate the facts, or reweigh the evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the Commissioner, not the courts, is responsible for making that decision. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Therefore, the Court will uphold the ALJ's decision if it is based on proper legal criteria and supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d

863, 869 (7th Cir. 2000); *see also* 42 U.S.C. § 405(g) (Westlaw 2005) ("[T]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive"). While substantial evidence is "more than a mere scintilla" of proof, it is no more than "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Above all, the Court need not determine whether the claimant is disabled. *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir.1993).

The Court's limited power of review does not grant the ALJ unlimited judicial deference. The ALJ must consider and minimally articulate an analysis of all relevant, and even conflicting, evidence. *Herron*, 19 F.3d at 333 (*quoting Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988)). While failing to articulate reasons for accepting or rejecting entire lines of evidence falls below this minimum level of articulation, *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.1993), this does not mean that the ALJ must make a written evaluation of each piece of evidence or testimony, *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985). In order for the Court to trace the path of the ALJ's reasoning, *Carlson*, 999 F.2d at 181 (7th Cir.1993), the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872.

17

## Social Security Regulations

Under the Social Security Regulations (the "Regulations"),
the ALJ must proceed through a five-step sequential analysis to
determine whether a claimant is disabled. 20 C.F.R. § 404.1520
(Westlaw current through July 11, 2005). The ALJ must consider
whether the claimant: (1) is currently employed; (2) has a severe
impairment or combination of impairments; (3) has an impairment
that meets or medically equals any impairment listed in the
Regulations as being so severe as to preclude gainful activity;
(4) is unable to perform her past work; and (5) is capable of
performing work in the national economy. *See* 20 C.F.R. §§
404.1520 and 416.920; *see also Young v. Sec'y of Health and Human
Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). An affirmative answer
on steps three and five leads to a finding of disabled.
*Clifford*, 227 F.3d at 868. A negative answer on any step, other
than step three, leads to a finding of not disabled. *Id.* The
burden of proof is on the claimant through step four, then shifts
to the Commissioner at step five. *Id.*

Residual functional capacity is what a claimant can still do
despite her physical and mental limitations. *Hickman v. Apfel*,
187 F.3d 863, 869 (7th Cir. 1999); 20 C.F.R. § 404.1545(a). The
claimant's RFC is used at steps four and five of the sequential
analysis to determine her ability to engage in various levels of
work (sedentary, light, medium, heavy, or very heavy). 20 C.F.R.

§ 404.1567. According to the Regulations, and as explained in SSR 96-8p, the ALJ must assess the claimant's work-related abilities on a "function-by-function basis," considering all relevant evidence, including physical, mental, and any other abilities affected by the claimant's impairments. SSR 96-8p; *see* 20 C.F.R. §§ 404.1545 & 416.945; *see also Cass*, 8 F.3d at 555.

Furthermore, while the Commissioner is responsible for developing the claimant's complete medical history, the claimant is responsible for "providing the evidence [the Commissioner] will use to make a finding about [her RFC]." 20 C.F.R. § 404.1545(a)(3). The claimant must "provide evidence showing how [her] impairment(s) affect [her] functioning" and ability to work. 20 C.F.R. § 404.1512(c). Again, the ALJ's RFC determination must be supported by substantial evidence in the record. *Clifford*, 227 F.3d at 869.

## DISCUSSION

The Commissioner argues that the ALJ's decision should be affirmed, because it is supported by substantial evidence. Despite repeated prodding from this Court, Plaintiff failed to file a Motion for Summary Judgment, or to file a Motion in Response to the Commissioner's Motion, supporting an argument that the decision should be reversed or remanded. Without the benefit of a brief from Plaintiff, the Court reviewed the Record and readily concludes that the decision should be affirmed.

In her decision denying Plaintiff's application for DIB, the ALJ discussed Plaintiff's medical records, and set forth the opinions and diagnoses from the various physicians that treated Plaintiff. The ALJ concluded that Plaintiff had not engaged in substantial gameful employment and suffered from severe impairments. At Step 3 of the sequential process, the ALJ made a decision adverse to Plaintiff's position - that Plaintiff's severe impairments neither met nor equaled a Listing. In making this determination, the ALJ set forth the relevant Listings, and discussed why Plaintiff's condition failed to satisfy them, while citing to the relevant medical and Record evidence.

Specifically, the ALJ found that Plaintiff did not meet or equal Listing 1.04, which deals with disorders of the spine. Listing 1.04 requires evidence of nerve root compression, characterized by neuro-anatomic distribution of pain, limitation or motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss, and, if the lower back is implicated, positive straight leg raising. In order to meet or equal this Listing, Plaintiff must satisfy all of the described criteria. The ALJ, however, found that Plaintiff demonstrated no marked and/or persistently abnormal clinical signs, nor any documented consecutive 12 month period of ineffective ambulation.

With regard to Plaintiff's mental impairment, the ALJ looked to Listing 12.04, which requires evidence of pervasive symptoms of depression, over at least twelve consecutive months, which markedly affect Plaintiff's functional capacity. The ALJ noted Plaintiff's hospitalization in August of 2003, when he reported suicidal ideation and was diagnosed with major depression. Following his discharge, Plaintiff failed to continue in outpatient treatment and failed to take medication.

The ALJ noted that, in describing his daily activities at the hearing, Plaintiff attributed most of his current limitations to his back pain, and not to feelings of depression. The ALJ stated that Plaintiff's one episode of decomposition occurred while he was drinking, and that Plaintiff had improved greatly with sobriety and medication.

On the flip side, there is scant evidence in the Record supporting a claim that Plaintiff's herniated discs and depression meet or equal the above discussed Listings. Plaintiff's MRI showed mild disc protrusion/herniation at L4-5 and L5-S1, without significant spinal stenosis and with generalized bilateral neuroforaminal narrowing. The state agency report submitted by Drs. Bergmann and Smalley further supported the ALJ's determination that Plaintiff's back pain did not meet or equal a Listing. *See Scott v. Sullivan*, 898 F.2d 519, 524

(7th Cir. 1990) (the ALJ may properly rely upon the opinions of consulting physicians).

Although Dr. Greenberg's findings following Plaintiff's second accident in April of 1999 indicated that Plaintiff was unable, at that time, to return to his past work, Plaintiff does not claim that he was disabled until February of 2001. Notably, Plaintiff was, in fact, able to perform light work at the bakery from August until December of 1999, as well as at Amphenol in late 2000 and early 2001. In addition, there is no evidence in the Record that Plaintiff visited a physician for treatment in 2000 or 2001, even though he had insurance coverage at that time. Finally, a later and more timely examination by Dr. Stronska indicated that Plaintiff's extremity motion was normal, strength in all extremities was full, sensation was intact, and there was no atrophy. Dr. Stronska found no neurological signs of compression from any alleged herniation, and strength, sensation, and motion of the lumbar spine were preserved.

Given the record evidence, the Court readily concludes that substantial evidence supported the ALJ's finding that Plaintiff's impairments, while severe, did not meet or equal a Listing.

Turning to the Fourth Step of the sequential analysis, the ALJ concluded that Plaintiff could return to his past relevant work as a cable tester, as well as a wide range of light and sedentary work. In doing so, the ALJ concluded that Plaintiff's

subjective complaints were not fully credible. The Court finds
that the ALJ's credibility determination comported with the
Regulations and Seventh Circuit caselaw. *See Pope v. Shalala,*
998 F.2d 473. 486 (7ᵗʰ Cir. 1993). The ALJ considered
Plaintiff's daily activities; the type, dosage and effectiveness
of his medications; other measures used to relieve pain and
symptoms; and Plaintiff's failure to seek treatment for his
symptoms, despite having insurance coverage, in concluding that
Plaintiff's complaints were not fully credible. While claiming
disabling pain, Plaintiff managed to cook, clean, vacuum, shop,
go camping, attend the theater and church, socialize with friends
and family, and visit Mexico. Notably, Plaintiff's gait
inexplicably varied from antalgic to normal at various clinical
examinations, as did Plaintiff's level of difficulty with heel
toe walking and getting on and off the examination table. This
evidence supports the ALJ's credibility determination.

In establishing Plaintiff's RFC, the ALJ concluded that
Plaintiff could lift, carry, push and/or pull up to 20 pounds
occasionally and up to 10 pounds frequently; sit, stand, and/or
walk throughout a normal workday with normal breaks; never climb
ladders, ropes, or scaffolds, or work on moving or unstable
surfaces; occasionally climb ramps or stairs, stoop, kneel crouch
or crawl,; and avoid exposure to unprotected heights or unguarded
hazardous equipment. This RFC determination was supported by a

November 2004 MRI of the lumbar spine, which showed only mild
disc protrusion/herniation at 14-5 and L5-S1, without significant
spinal stenosis, and generalized bilateral neuroforanimal
narrowing; as well as Dr. Stronska's conclusion that there were
no neurological signs of compression from any alleged herniation.
The ALJ's RFC was also consistent with physical therapist John
McConnell's 1999 recommendation that Plaintiff not lift objects
over 20 pounds, and restricting squatting and kneeling, as well
as bending.  R. at 244.

The ALJ properly presented these limitations to the VE, who
opined that an individual with these limitations could perform
Plaintiff's past relevant work as a cable tester, as well as a
significant number of other jobs in the economy.  Under these
circumstances, the Court cannot conclude that the ALJ erred.

## CONCLUSION

The Commissioner has aptly demonstrated that substantial evidence supports the ALJ's conclusion that Plaintiff can return to his past relevant work as a cable tester. Therefore, the Commissioner's Motion for Summary Judgment to affirm its decision is GRANTED.

Dated: July 20, 2006      E  N  T  E  R E D:

ARLANDER KEYS
United States Magistrate Judge